# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **AJSJS Development, LLC,** | * | **CIVIL ACTION No.** |
| | * | |
| *Plaintiff* | * | |
| **versus** | * | **SECTION:** |
| | * | |
| **Parish of St. John the Baptist and** | * | |
| **St. John the Baptist Parish Council,** | * | **MAG. DIV.:** |
| | * | |
| *Defendants* | * | |
| | * | **JURY TRIAL REQUESTED** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT.

   **NOW INTO COURT,** through its undersigned counsel, comes plaintiff, AJSJS Development, LLC ("AJSJS" or "plaintiff"), in the capacities described below, and brings this action against defendants, the Parish of St. John the Baptist ("Parish") and St. John the Baptist Parish Council ("Council") (collectively, "defendants"), and respectfully avers:

### I. NATURE OF THE ACTION.

   1.  This is an action for compensation in the amount of at least $150 million dollars owed to plaintiff by defendants as a result of defendants' permanent *per se* taking of plaintiff's property in violation of the Takings Clause of the United States Constitution, U.S. CONST., Amend. V ("….nor shall private property be taken for public use, without just compensation") and the Louisiana Constitution, La. CONST. art. I, § 4 ("Property shall not be taken by the State or its political subdivisions except for public purposes and with just compensation paid to the owner….").

2.  AJSJS entered into a Solid Mineral Lease With Option to Purchase (the "Montegut Mineral Lease"), which granted it "the exclusive right to enter upon and use [the leased property] for the exploration for, production of, and sale to third parties of clay, soil, sand and all other solid minerals" found on and in the leased property, which is hereinafter referred to as the "Montegut Tract" or "Montegut Clay Pit."

3.  AJSJS intended and began preparatory operations to make the clay material available at a fair market price to the U. S. Army Corps of Engineers (the "Corps of Engineers") and/or its contractors for the construction of the West Shore Lake Pontchartrain Hurricane and Storm Damage Risk Reduction Project (the "WSLP Project").

4.  The term of the Montegut Mineral Lease is "for a period of Three (3) years from the date [AJSJS] procures approval to commence operations from local, state and federal authorities, as needed…"

5.  Defendants unlawfully prevented AJSJS from obtaining the local permits the Parish itself required to commence operations on the Montegut Clay Pit, by illegally denying on July 12, 2022 a request to rezone the Montegut Tract from the erroneous Residential District One ("R-1") zoning classification that has been assigned to it, to the more appropriate Rural ("R") classification required by the Parish's Future Land Use Map.

6.  The rezoning of the Montegut Tract is a necessary step that has to be completed (1) to obtain the local permits required by the Parish to commence operations on the Montegut Clay Pit, because clay mining operations are not allowed within the R-1 district; and (2) to obtain certification from the U.S. Corps of Engineers as a Commercial Borrow Pit qualified to supply clay for levee construction.

7. Defendants illegally refused to rezone the Montegut Tract on July 12, 2022 because of two reasons unrelated to its proper zoning classification. First, the defendants' decision was based on their self-serving desires, commitments and/or agreements to assist Greenfield Exports, LLC and Greenfield of Louisiana, LLC (collectively "Greenfield") in the construction and operation of a 36-silo Greenfield Louisiana Grain Terminal ("Greenfield Grain Terminal") that Greenfield proposed to build in St. John the Baptist Parish, a project that was later abandoned and never built. The Greenfield Grain Terminal project had been in the works since 2018; was formally announced in March, 2021; and was officially cancelled in August, 2024.

8. In order to assist Greenfield with the cost of building and operating the Greenfield Grain Terminal, on April 13, 2022, the Port of South Louisiana (the "Port"), Greenfield Louisiana, LLC and the Sheriff of St. John the Baptist Parish, as Ex-Officio Tax Collector, entered into a Cooperative Endeavor and Payment in Lieu of Taxes Agreement ("Cooperative Agreement") that allowed Greenfield to avoid paying $200 million in *ad-valorem* taxes that normally would have been assessed on the Greenfield Grain Terminal property during a 30-year period.

9. In order to implement the Cooperative Agreement, on June 17, 2022 Greenfield conveyed to the Port, and leased back from the Port, all the 1,506.4 acres of land Greenfield purchased for the location and construction of the Greenfield Grain Terminal.

10. Then, on October 3, 2022, Greenfield sub-leased 214.5 acres that contain clay deposits (out of the 1,506.4 acres) to D. Hayes Enterprise, LLC, which, like AJSJS, intended to provide clay for the construction of the WSLP Project to the Corps of Engineers or its contractors.

11. To compensate Greenfield for the sub-lease, D. Hayes Enterprise, LLC in turn agreed to pay Greenfield $2.00 for each ton of clay excavated and removed from the 214.5 acres sub-leased, or a total of approximately $15,600,000 during the term of the sub-lease, which expires on December 31, 2026.

12. Defendants had also committed themselves to issuing, and on November 17, 2022 issued Permit No.15934 to D. Hayes Enterprise, LLC, without even discussing it at an Administrative Meeting. The permit allowed D. Hayes Enterprise, LLC to operate a clay pit (the "Greenfield Clay Pit") on the 214.5 acres it sub-leased from Greenfield.

13. Whereas the Greenfield land is located on the west bank of the Mississippi River, the Montegut Tract is located on the east bank, only 1,200 yards from WSLP Project, giving the Montegut Clay Pit several competitive advantages over the Greenfield Clay Pit. Those advantages include a lower cost to transport the clay to the work-site. Therefore, the overall cost of clay purchased from AJSJS for the WSLP Project would be much lower than the overall cost of clay purchased from D. Hayes Enterprise, LLC, and defendants illegally denied the rezoning of the Montegut Tract solely to protect and benefit Greenfield and D. Hayes Enterprise, LLC and to keep AJSJS from competing with them.

14. Second, the Parish President, Jaclyn Hotard, had her own personal interest in assisting Greenfield to build the Greenfield Grain Terminal. The construction and operation of the Greenfield Grain Terminal would have benefited Gaumet Holdings, LLC, a company that was owned by Darla Gaudet, the Five J's Trust and the Charles Keith Metcalf Trust.

15. Darla Gaudet is the trustee of the Five J's Trust. The beneficiaries of the Five J's Trust are Darla Gaudet's children, including her son, Russell J. Gaudet, III, who has been

married to the Parish President, Jaclyn Hotard, since April, 2019. Darla Gaudet is the mother-in-law of the Parish President, Jaclyn Hotard.

16. The beneficiaries of the Charles Keith Metcalf Trust are Darla Gaudet's nieces and nephews, who are also the cousins of the Parish President's husband.

17.  St. John Fleeting is a multifunctional inland marine and transportation company, located at Mile Marker 140 of the Mississippi River, where it provides fleeting services for up to 300 barges at the time. St. John Fleeting was owned until recently by St. John Fleeting, LLC and its President was Darla Gaudet. On November 17, 2025 it was announced that Turn Services, LLC had signed an agreement to acquire St. John Fleeting.

18. Anticipating the construction of the Greenfield Grain Terminal, in 2019 Darla Gaudet, Gaumet Holdings, LLC and/or their related companies, including St. John Fleeting, LLC, began purchasing all the properties they could purchase on or near the 1506.4 acres of land where Greenfield proposed to build the Greenfield Grain Terminal, including land where a critical rail extension to the Greenfield Grain Terminal was located, and land on the Mississippi River Batture near the proposed Greenfield Grain Terminal, where Darla Gaudet was trying to establish another fleeting service similar to St. John Fleeting to provide fleeting services expected from the operation of the Greenfield Grain Terminal.

19. The Parish President, Jaclyn Hotard, reportedly referred to the increase in fleeting business expected by Gaumet Holdings, LLC from the construction of the Greenfield Grain Terminal as a "generational opportunity" for the Gaudet and Metcalf families, including her husband, Russell J. Gaudet, III, and she took steps to protect the "generational opportunity" by helping the Council deny the rezoning of the Montegut Tract, thereby preventing AJSJS from

obtaining the required permits for the operation of the Montegut Clay Pit, which would have also triggered the start of the Montegut Mineral Lease.

20. Through their illegal and self-serving actions, defendants interfered with, abrogated, impaired and destroyed the value of plaintiff's Montegut Mineral Lease, and destroyed plaintiff's contract expectancy and plaintiff's protected ownership interest in the Montegut Mineral Lease, which became worthless as a result of the actions taken by defendants. Through their illegal and self-serving actions, defendants took plaintiff's property without paying just compensation, in violation of the Takings Clause of the United States Constitution and art. I, § 4 of the Louisiana Constitution.

## II. THE PARTIES.

### Plaintiff.

21. The plaintiff in this suit is AJSJS Development, LLC ("AJSJS"), individually and as a member of a joint venture it entered into with the AIMS Group, Inc., Warren G. Treme and Fred Kinsley for the purpose of mining, excavating, removing and processing clay material from the property referred to as the "Montegut Tract" or the "Montegut Clay Pit" located in the Parish of St. John the Baptist, and to make the clay material available at a fair market price to the U. S. Army Corps of Engineers (the "Corps of Engineers") and/or its contractors for the construction of the West Shore Lake Pontchartrain Hurricane and Storm Damage Risk Reduction Project (the "WSLP Project").

22. AJSJS is a limited liability company established pursuant to the laws of the State of Louisiana, with its principal place of business in the Parish of Jefferson, State of Louisiana.

**Defendants.**

23. Defendant, the Parish of St. John the Baptist (the "Parish"), is a public entity and a political subdivision of the State of Louisiana, capable of suing and being sued, located in the State of Louisiana within the jurisdiction of this Court. At all times material hereto, the Parish and its employees, including the Parish President, Jaclyn Hotard, acted under color of state law.

24. Defendant, St. John the Baptist Parish Council (the "Council"), is the governing body of the Parish and a duly elected body, capable of suing and being sued, residing in the Parish of St. John the Baptist, State of Louisiana, within the jurisdiction of this Court. The Council is vested with authority to approve or deny ordinances adopting or modifying the Official Zoning Map and the zoning plan of the Parish, as well as to grant Parish permits and zoning change applications.

### III.   JURISDICTION AND VENUE.

25. This Court has original jurisdiction pursuant to 28 U.S.C. §1331 because the claims asserted in this action are based on the Takings Clause of the United States Constitution, U.S. CONST., Amend. V, which is self-enforcing and/or made applicable by the U.S. CONST., Amend. XIV and the Civil Rights Act of 1871, 42 U.S.C. §1983. This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3), which confers original jurisdiction on federal district courts to hear suits alleging violations of rights, including property rights, and privileges granted by the United States Constitution. *See Lynch v. Household Financial Corporation,* 405 U.S. 538 (1972).

26. An actual justifiable controversy exists between plaintiff and defendants within the meaning of 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure

regarding defendants' taking of plaintiff's property without just compensation as required by law.

27. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over all other claims so related to the claims asserted within the Court' original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) (1) and (2) because the defendants reside in this district, a substantial part of the events or omissions giving rise to the claims asserted in this suit occurred in this district, and the property that is the subject of this action – the Montegut Mineral Lease – pertains to land located within this district.

29. This case is ripe for adjudication because (1) on July 12, 2022 the Parish denied the application to rezone the Montegut Tract, and the decision is final; and (2) in 2019 the United States Supreme Court overruled *Williamson County Regional Planning Commission v. Hamilton Bank of Jefferson City,* 473 U.S. 172 (1985), which held that property owners must seek just compensation under state law in state court before bringing a federal takings claim under 42 U.S.C. § 1983. *See Knick v. Township of Scott, Pennsylvania, et.al.,* 588 U.S. 180 (2019). A plaintiff may now bring his takings claim directly to federal court without first having to file a claim in state court.

30. AJSJS has standing to bring this suit because it is the lessee in the Montegut Mineral Lease, which is a contract owned by AJSJS that has been taken by the defendants without just compensation. *United States v. General Motors Corp.,* 323 U.S. 373(1945); *Lynch v. United States,* 292 U.S. 571, 580 (Contracts "are impaired within the meaning of the Constitution (article 1, § 10, cl. 1) whenever the right to enforce them by legal process is taken away or materially lessened.").

31. This suit is timely because prior federal litigation between the same parties, which was dismissed without prejudice, tolled the applicable prescription period. La. C.C. art. 3462; *Taylor v. Liberty Mutual Insurance Co.,* 579 So. 2d 443 (La. 1991) ("…we conclude that such a suit [filed in federal court] has the same interruptive effect whether it is filed in a federal, Louisiana or another state's forum, if the suit is properly and timely filed under the laws of the forum."); *Henry v. Southwest Airlines,* No. 23-CA-522 (La. 5th Cir. 7/31/2014).

## IV. FACTUAL ALLEGATIONS.

32.  On October 30, 2018, AJSJA entered into a Solid Mineral Lease With Option to Purchase (the "Montegut Mineral Lease") with the owners of the Montegut Tract, Dr. Christy Montegut and his siblings.

33. The Montegut Mineral Lease granted AJSJS "the exclusive right to enter upon and use [the leased property] for the exploration for, production of, and sale to third parties of clay, soil, sand and all other solid minerals" found on the Montegut Tract.

34. The Montegut Tract, Lot C, Elvina Plantation, consists of 162 acres located in the area generally bounded by W. Airline Highway, Interstate 10, U.S. Highway 51 and Windsor Avenue, in La Place, Parish of St. John the Baptist, Louisiana, and contains approximately six million tons of clay material.

35. AJSJS intended to make the clay material available at a fair market price to the Corps of Engineers and/or its contractors for the construction of a 18.25 mile levee system designed to prevent storm-induced flooding in St. John the Baptist, St. Charles and St. James Parishes, which is the main feature of the West Shore Lake Pontchartrain Hurricane and Storm Damage Risk Reduction Project (the "WSLP Project"), a federal flood-prevention project the Corps began

planning in the 1970's and started building in 2019 after obtaining Congressional approval and funding in July 2018.

36. The Takings Clause of the Fifth Amendment provides that private property may not "be taken for public use, without just compensation." U.S. CONST. amend. V; *Muir v. Wisconsin,* 137 S. Ct. 1933, 1942 (2017). This "guarantee was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

37. The Takings Clause protects real property, *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393 (1922) (regulation prohibiting the mining of coal effects a taking) and personal property. *Horne, et. al. v. Department of Agriculture,* 560 U.S. 513 (2014) (requirement that growers set aside a certain percentage of their raising crops for account of the government, free of charge, is a taking). It applies against the States through the Fourteenth Amendment. *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 122 (1978); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980).

38. In *United States v. General Motors Corp.,* 323 U.S. 373, 375 (1945), the Supreme Court applied the Takings Clause to a lease. The Court held that "[t]he constitutional provision is addressed to every sort of interest the citizen may possess" and full ownership of the property is not a requirement to receive compensation for a taking. *See Lynch v. United States,* 292 U.S. 571, 580 (Contracts "are impaired within the meaning of the Constitution (article 1, § 10, cl. 1) whenever the right to enforce them by legal process is taken away or materially lessened."), *citing Worthern Co. v. Thomas,* 292 U.S. 426 (1934) and *Home Building and Loan Ass. v. Blaisdell,* 290 U.S. 398 (1934). *See also Long Island Water Supply Co, v, Brooklyn,* 166 U.S. 685, 690 (1897); *Omnia Commercial Co., Inc. v. United States,* 261 U.S. 502,508 (1923)

("The contract in question was property within the meaning of the Fifth Amendment….and if taken for public use the Government would be liable."); *Florida Rock Industries, Inc. v. United States,* 791 F. 2d 893, 895 (Fed. Cir. 1986) ("The act that allegedly constituted the taking, denial of a permit to discharge dredged or fill material into navigable waters and other waters of the United States" held to be property within the meaning of the Fifth Amendment.).

39. Likewise, "[t]he action for inverse condemnation [for a taking in violation of the Louisiana Constitution] is available in all cases where there has been a taking or damaging of property where just compensation has not been paid, without regard to whether the property is corporeal or incorporeal." *State, Through Dept. of Transp. and Dev. v. Chambers Investment Company, Inc.,* 595 So. 2d 598, 602 (La. 1992). *See also Steve Crooks, et. al. v. State of Louisiana, Department of Natural Resources,* No. 2019-C-0160 (La. 01/29/20) ("Inverse condemnation claims derive from the Takings Clauses contained in both the Fifth Amendment of the U.S. Constitution and Art. I, § 4 of the Louisiana Constitution.").

**The Montegut Tract.**

40. The Montegut Tract contains deposits of the finest clay material for levee construction in the entire area. The high quality of the clay material was confirmed in a report dated February 28, 2019, prepared by The Beta Group engineering and construction services, which analyzed soil samples taken from a series of 16 borings drilled on the property.

41. The Montegut Tract's north boundary is located only 1,200 yards from the WSLP Project construction site and its close proximity, coupled with the high quality of its clay material, provided the Montegut Clay Pit competitive, economic and environmental advantages over other area clay pits that wanted to compete and be qualified as approved purveyors of clay material for the construction of the WSLP Project levee, including the Greenfield Clay Pit.

42. According to the Code of Ordinances of St. John the Baptist Parish (the "Parish Code") first adopted in 1988, permitted uses in the Rural ("R") district (or areas zoned Rural) include "[a]griculture, including the raising of livestock farming" and "[e]xcavation of minerals, or materials including, but not limited to, sand, gravel, rock, clay, ores, liquid or gaseous fossil, fuel….." *See* Parish Code § 113-165.

43. The Montegut Tract is part and sits atop of the Bonnet Carré Oil and Gas Field, an active oil and natural gas field first discovered in 1957, which started producing oil and gas in 1960. According to production reports filed by McGowan Working Partners, Inc., the owner of at least 16 out of 34 wells that were drilled and completed by 1965, its 16 wells were still producing oil and gas on January 1, 2021. Since the 1950's, the surface of the Montegut Tract has continuously been, and until recently was, used for oil and gas production and agricultural sugar cane cultivation.

44. Agricultural activities and extraction of liquid and gaseous fossil fuels have taken place continuously since at least 1960 on the Montegut Tract and on the approximately 1500 acres that comprise the Bonnet Carré Oil and Gas Field, of which the Montegut Tract is part. These historical and active uses clearly indicate that the proper zoning classification for the Montegut Tract and  approximately 1500 acres that comprise the Bonnet Carré Oil and Gas Field should be Rural ("R") rather than Residential District One ("R-1"). Oil and gas extraction and sugar cane cultivation are not permitted activities in the R-1 district, but they are allowed in the Rural district. *See,* Parish Code §§ 113-165, 113-180 and 113-182.

45. Another reason why homes cannot be (and never have been) built on the 1500 acres that comprise the Bonnet Carré Oil and Gas Field (which includes the Montegut Tract) is nearly

80% of the 1500 acres sit on a FEMA flood zone designated "AE" -- a High Risk Special Flood Hazard Area -- and the balance on an area designated "X" -- a Moderate Risk Area.

46.  The relevant FEMA Flood Insurance Rate Maps ("FIRM") adopted by the Parish and published in the Parish website (maps 22095C0230, 22095C0240 and 22095C0250) clearly show that nearly 80% of the 1500 acres that comprise the Bonnet Carré Oil and Gas Field and the Montegut Tract have a flood base elevation of 7 to 8 feet and thus are subject to a 100-year flood of between 7 to 8 feet of water. Therefore, if a  Katrina-like event should occur in the Parish, every home built on the Montegut Tract would be flooded by waters 7 to 8 feet deep or deeper.

**The Parish assigned an erroneous zoning classification to the Montegut Tract.**

47. In 1984, through Ordinance No. 84-38, the Council adopted the Parish's first official zoning ordinance (*"The Comprehensive Zoning Ordinance of the Parish of St. John the Baptist, Louisiana"*), consisting of text and maps, without the benefit of a comprehensive plan for development of the Parish. In 1988 the Council adopted the Parish Code (still without the benefit of a comprehensive plan for development), which incorporated the 1984 zoning ordinance and the Official Zoning Map. *See,* Parish Code § 113-143.

48. The Council ignored the historical and active uses, and the flooding characteristics, of the Montegut Tract and of the approximately 1500 acres that comprise the Bonnet Carré Oil and Gas Field (of which the Montegut Tract is part) when it assigned the most restrictive residential zoning -- Residential District One ("R-1") -- to the entire area.

49. In the year 2001 and in preparation for the development of the Parish's first comprehensive land use plan, the Council and the Parish Administration contracted with the College of Urban and Public Affairs ("CUPA") at the University of New Orleans ("UNO"), Meyer Engineers, Ltd. and Charbonnet and Associates to study the immediate needs of the

Parish regarding planning and zoning.

50. In July 2002, the Louisiana Urban Technical Assistance Center ("LUTAC"), the professional public service arm of CUPA, issued a report entitled "St. John the Baptist Parish -- Comprehensive Planning Project -- Phase I, Task I: Short Range Planning Evaluation, Permitting Procedure Review, Code Enforcement and Inspection, Subdivision Regulation and Zoning Ordinance" (the "LUTAC 2002 Report").

51. The LUTAC 2002 Report addressed the activities denoted as "Task I," conducted during Year 1 of what was going to be and subsequently became a complex multi-year process to develop a comprehensive plan for the Parish. Task I involved a review of the Parish's planning and zoning policies and activities and the development of an administrative plan.

52. In addressing Task I, LUTAC studied relevant sections of the Parish's Charter, which governs the operations of Parish government. LUTAC reviewed the planning and zoning related roles and actions of the Parish Council for 2001, the Planning and Zoning Commission meeting minutes for 2001, the Zoning Board of Adjustments meeting minutes from 1996 to 2001, and the Utility Board meeting agendas for 2001. LUTAC reviewed reports produced from June 2000 to July 2001, and interviewed the Director of the Planning and Zoning Department. LUTAC also reviewed the Parish's Subdivision Regulations and Zoning Ordinances, and studied the Parish's geographic information system ("GIS") and consulted with Geographic Computer Technologies ("GCT"), the Parish's GIS consultant. As a result of that research, LUTAC developed a series of recommendations for improving development and enforcement related policies and activities within the Parish government.

53. According to the LUTAC 2002 Report, the Ordinance adopted in 1984 by the St.

John the Baptist Parish Council consisted of text and a series of maps. Both the text and the maps had been amended many times since then, but remained in need of further revision. Through a review of the zoning ordinance, subdivision regulations and Utility Board provision, LUTAC concluded that large areas of the Parish appeared to have been zoned incorrectly as R-1 instead of "R":

> **Regarding the zoning map, large areas of the Parish seem to be zoned incorrectly. For example, much of the west bank of the Parish is zoned R-1 Single Family Residential District when the actual predominant land use is agriculture. This causes problems when property owners try to develop anything, because R-1 Single Family is the most restrictive zoning category. It may be the case that the intent was to zone the area "R" – Rural but the "R" was misinterpreted as "R-1" Residential. Therefore, the Parish zoning map must be revised to correct inappropriate zoning.** (Emphasis in the original).

54. At least one other suit was soon thereafter filed in 2002 in this Court as a result of the Parish having erroneously assigned the R-1 classification, instead of the Rural classification, to a tract of land. *See e.g., Jules J. Viosca, III, et.al. v. St. John the Baptist Parish, et. al.*, Civil Action No. 02-cv-0907, United States District Court, Eastern District of Louisiana. The Parish quickly settled that suit, which clearly put the Parish on notice of the erroneous zoning classification of land throughout the Parish and the need for correction. However, the Council did not correct the zoning errors.

55. Active oil and gas extraction from natural deposits and sugar cane cultivation are not permitted uses in the R-1 district, but they are permitted in the Rural district. Among the permitted uses in the R-1 district are single-family detached residences, schools, churches and community homes. However, those structures cannot be built on a high risk flood hazard area subject to 7 to 8 feet of flooding and located atop an active oil and gas field, without endangering the lives of their residents. *See* Parish Code § 113-3(a) ("The flood hazard areas of

the parish are subject to periodic inundation that results in loss of life and property, health and safety hazards…..."). Logically, the entire area, including the Montegut Tract, should never have been zoned Residential District One (R-1).

56.   The Parish and the Council failed to correct the zoning errors identified in the LUTAC 2002 Report, all to the detriment of AJSJS and resulting in the taking of its property and causing damages in the amount of at least $150 million dollars.

**The effects the erroneous zoning classification of the Montegut Tract has had on the plaintiff.**

57. Commercial clay pit operations are not permitted in the R-1 zoning district, but they are allowed in the Rural district. *See* Parish Code, §§ 113-180, 113-165. Therefore, the R-1 classification assigned by the defendants to the Montegut Tract (and to the 1500 acres that comprise the Bonnet Carré Oil and Gas Field) and the defendants' refusal to change it to the Rural classification, have prevented and will continue to prevent plaintiff from obtaining the necessary local permits to commence operations on the Montegut Clay Pit.

**The zoning classification given to the Montegut Tract by the Parish is inconsistent with the Parish Comprehensive (or "Master") Plan.**

58. Louisiana law requires that "[t]he regulations [creating zoning districts] shall be made in accordance with a comprehensive plan" adopted by a parish. Moreover, "[t]he regulations shall be made with reasonable consideration of the character of the district and its <u>peculiar</u> suitability for particular uses, and with a view to ….encouraging the most appropriate use of land throughout the municipality." Louisiana Revised Statute 33:4723; *King v. Caddo Parish,* 719 So. 2d 410 (La. 1998) (once a parish has adopted a comprehensive plan, its zoning regulations and policies must be consistent with it).

59. In 2001 the Parish began a 13-year-long process of preparing and adopting a comprehensive plan. On September 15, 2014, in accordance with Louisiana Revised Statutes 33:101-106, the St. John the Baptist Parish Planning Commission ("Commission") adopted the Parish Comprehensive Plan, which is entitled *"St. John the Baptist Comprehensive Plan: One Parish, One Future"* (the "Parish Comprehensive Plan").

60. The Parish Comprehensive Plan includes, at p. 41, a Current Land Use Map; at p. 47, a Future Land Use Map; and at p. 69, a Flood Map. The Current Land Use Map shows that the Montegut Tract and the entire Bonnet Carré Field are being used for agricultural purposes. The Future Land Use Map does not apply the R-1 zoning classification to the Montegut Tract or to the Bonnet Carré Oil and Gas Field. Instead, the entire area is designated as "Undeveloped or Agriculture" in the Future Land Use Map.

61. By designating the Montegut Tract and the entire area as "Undeveloped or Agriculture," the Parish Comprehensive Plan and the Future Land Use Map effectively reclassified the zoning of the entire area that comprises the Bonnet Carré Oil and Gas Field and the Montegut Tract from Residential District One ("R-1") to Rural ("R").  However, the Parish did not amended the Official Zoning Map to make it consistent with the Parish Comprehensive Plan and the Future Land Use Map, and the Parish continued to apply the R-1 zoning classification shown in the Official Zoning Map to the Montegut Tract and the entire Bonnet Carré Oil and Gas Field, in violation of the consistency requirements of Louisiana law.

**An application was filed requesting that the Council rezone the Montegut Tract to the Rural classification in order to be able to obtain the necessary permits to operate the Montegut Borrow Pit.**

62.  No federal or state permit is necessary to operate the Montegut Clay Pit. On March 9, 2020, Warren G. Treme, on behalf of AJSJS, filed a Joint Permit Application with the Corps of

Engineers and the Louisiana Department of Natural Resources for a permit to operate the Montegut Clay Pit on the Montegut Tract. By letter dated April 22, 2020, the Corps informed Mr. Treme that a Corps of Engineers permit under Section 404 of the Clean Water Act was not required.

63.    On June 2, 2020, Dr. Christy Montegut, one of the owners of the Montegut Tract, working in concert with AJSJS' representative, the AIMS Group, Inc., applied to the St. John the Baptist Parish Planning and Zoning Department (the "Planning and Zoning Department") to have the Montegut Tract rezoned to the Rural district (which allows the removal of clay material from the ground, consistent with the Parish Comprehensive Plan, the Future Land Use Map and the zoning district requirements) in order to establish a "dirt pit" solely to provide clay material to the Corps of Engineers for the construction of the WSLP Project. Dr. Montegut's zoning change request was docketed with the Planning and Zoning Department as "Permit # PZR-1181."

64.    On June 9, 2020, during a regular meeting of the Council, Councilman Arcuri read the following statement he had prepared to explain the benefits the Montegut Clay Pit could bring to the Parish, as reflected in the Council Minutes of the meeting:

**DEPARTMENT/ENGINEER REPORTS:**

<u>**Robbie Arcuri – Discussion regarding proposed Montegut Borrow Pit**</u>

Councilman Arcuri stated, "Okay, I'd like to read a statement that I just put together so I don't miss anything, so bear with me. Fellow Councilmen, the reason I'm bringing up this topic of the proposed Montegut Pit, is to let the public know how this project could affect St. John Parish and the levee project as a whole. This will be the biggest engineering project in St. John history. For reference, the proposed Borrow Pit site is located North of Airline Highway between Old 51 neighborhood and River Forest Subdivision. The site would be approximately one-third mile, West from River Forest and one-half mile East from the Old 51 neighborhood. The site is bordered on the Westside by the United Stated Corps of Engineers staging site, for borrow material. Clay will be staged and processed there then used for the construction of the levee. There is also an access road that intersects the site that will connect to the levee and will be used to transport clay to the levee

construction site. The Corps of Engineers has leased this property and identified this site as a strategic location to stockpile 3-4 million cubic yards of material in their Draft Supplemental Environmental Report. The Montegut site meets the Corps of Engineers requirements for borrow material and would be ready to supply the project with up to 7 million cubic yards of material needed for the first lift of the levee if permitted by the parish. There is still a solicitation process that the Corps will initiate to identify and solicit bids for clay needed for the West Shore project. This site, if permitted by the parish will allow the Montegut site to participate in a Corps of Engineering bidding process for clay. The Montegut site if selected would significantly reduce truck traffic on Airline Highway, the borrow material, once excavated would be staged on the Corps staging site, adjacent to the borrow pit and would be processed and trucked to the levee site on the access road that intersects the staging area. The proposed project would also provide a sales tax benefit to the parish for the sale of borrow material to the Corps, from the sale. The Montegut site is zoned R1, and to be eligible to be granted the Conditional Use Permit for a clay pit, the 123-acre site would have to be rezoned to rural. If a zoning request is granted, after public comment and Planning Board approval, and conditions are met for the Conditional Use Permit, the Council would then be required to initiate a Resolution to grant the permit. The landowner and their representatives have turned in a zoning change request, and paperwork for the Conditional Use Permit. I met with Mr. Pastorek last week, and he stated that both permit request could be worked in parallel to minimize any delays in the permitting process while still adhering to the ordinances. I had spoken to the River Forest Homeowners Association President, and, also, the Old 51 President and discussed the proposed project so they could communicate with their residents and inform them of their roll in the public comment process that will take place concerning this matter. I had spoken with Mr. Klein with the CPRA, also about this site, and he said he would be happy to meet with the Council and discuss any questions we have on the levee project. That's all I have to say about it, I believe I don't want to try to make a hard sell to face for this site, but what I want to do, is to inform the public the benefits that this site could probably help St. John Parish out with this excess sales tax and the reduction of trucks on Airline Highway. With that I'll open it up for discussion if anybody wants to discuss, if that's appropriate."

65. In the same month of June 2020, Greenfield retained Ramboll Corporation to perform a Phase I Environmental Assessment of the former Formosa property it was considering to purchase to build the Greenfield Grain Terminal. Therefore, the Greenfield Grain Terminal project was moving forward at that time.

66. A hearing was held July 20, 2020 by the St. John the Baptist Parish Planning and Zoning Commission ("Commission") to consider Dr. Montegut's rezoning request and thereafter

provide recommendations to the Council in accordance with Parish Code § 113-78. The role of the Commission is only advisory because changes of the Official Zoning Map or the Parish Comprehensive Plan can only be accomplished by adoption of an ordinance, a function reserved to the Council. *See* Parish Code, Article IV § (A)(4).

67. The Commission voted 6-2, with one member absent, to recommend to the Council that the rezoning request be denied. *See Official Proceedings of the St. John the Baptist Planning Commission Meeting Held Monday, July 20, 2020* (the "Commission's Record").

**The Parish President introduced Ordinance 20-19 to rezone the Montegut Tract but it was ultimately denied.**

68. A zoning change can only be accomplished by enacting an ordinance. *See* Parish Code, Article IV § (A)(4). An ordinance may be introduced only by a council member or the Parish President at any regular or special meeting of the Council. *See* Parish Code, Article IV § (B)(3)(b).

69. Notwithstanding the Commission's July 20, 2020 vote to recommend denial of the Montegut Tract rezoning request, on July 28, 2020, during a regularly scheduled meeting of the Council, the Parish President, Jaclyn Hotard, introduced Ordinance 20-19 to "approve the rezoning of [the Montegut Tract] from the Commercial District Three (C-3) and Residential District One (R-1) to the Rural District (Rural)."

70. Ordinance 20-19 came up for consideration during two Council meetings, but it was ultimately denied during the second meeting held August 28, 2020. On August 25, 2021, plaintiff filed suit against defendants. *AJSJS Development, LLC, et.al. v. Parish of St. John the Baptist, et.al.,* Civil Action No. 21-cv-1607 c/w Civil Action No. 22-19, in the United States District Court for the Eastern District of Louisiana (collectively, the "Federal Litigation").

20

**Second attempt to obtain the change of zoning for the Montegut Tract.**

71. A potential settlement was reached on February 23, 2022 between plaintiff and defendants in the Federal Litigation. It was agreed that plaintiff would resubmit the application to rezone the Montegut Tract, which was done. At the Commission's meeting held June 27, 2022, the Commission members voted in favor of rezoning the Montegut Tract. Unfortunately, at the Council meeting held July 12, 2022, the Council members disregarded the Commission's recommendation and the Parish's Master Plan, and voted against the rezoning request. The Federal Litigation then continued.

72. On February 6, 2023, the District Court dismissed with prejudice the Federal Litigation for lack of standing. Plaintiff appealed and on February 16, 2024, the Fifth Circuit Court of Appeals upheld the dismissal, but made the dismissal without prejudice.

**Additional steps taken by the Parish President to support Greenfield for her own personal gain.**

73. Louisiana Revised Statute provides that a public servant generally shall "not participate in a transaction involving a governmental entity in which, to his actual knowledge" she or a member of her immediate family "has a substantial economic interest." In such a situation, the public servant "shall disqualify" herself from participating.

74. The Parish President, Jaclyn Hotard, should not have participated in any matter or proceeding pertaining to the Montegut Clay Pit because of her and her husband's substantial economic interest in the Greenfield Grain Terminal and Greenfield's sub-lease to D. Hayes Enterprise, LLC for the purpose of operating the Greenfield Clay Pit that would have had to compete with the Montegut Clay Pit.

75. The Parish President's husband, Russell J. Gaudet, III, and the Parish President's mother-in-law, Darla Gaudet, had substantial interests in AJSJS not being able to operate the

Montegut Clay Pit, and she was required to disqualify herself from any and all matters pertaining to the Montegut Tract and the Montegut Clay Pit. But she did not.

76. On September 21, 2023 after the land purchased by Greenfield for the Greenfield Grain Terminal was judicially rezoned R-1, the Parish President, Jaclyn Hotard, acting on behalf of the Council, submitted an application to the Parish Planning Commission for the rezoning of the 1,506.4 acres of land Greenfield purchased for the Greenfield Grain Terminal, including the 214.5 acres that Greenfield sub-leased to D. Hayes Enterprise, LLC for the Greenfield Clay Pit.

77. On April 9, 2024, Parish President Jaclyn Hotard again used her office to assist Greenfield by introducing an ordinance (24-18) to have the Council approve the rezoning of the "land leased to Greenfield Louisiana, LLC" from largely "Residential District 1 (R-1) to Industrial District 3 (I-3)."

### The decision to build the West Shore Lake Pontchartrain Hurricane and Storm Damage Risk Reduction Project.

78. The Corps of Engineers designed and is in the process of building the West Shore Lake Pontchartrain Hurricane and Storm Damage Risk Reduction Project (the "WSLP Project"), which will provide risk reduction measures to address the effects of tropical/hurricane storm surge events in St. John the Baptist, St. Charles and St. James Parishes.

79. In November 2014, the Corps published the *West Shore Lake Pontchartrain Hurricane and Storm Damage Risk Reduction Study -- Final Integrated Feasibility Report and Environmental Impact Statement* ("Feasibility Report") recommending construction of the WSLP Project. The WSLP Project was authorized as a Hurricane and Storm Damage Risk Reduction System project and as part of the Bipartisan Budget Act of 2018, Public Law 114-322, section 1401(3)(5). Congress appropriated $760 million to fully fund the WSLP Project, with a 30-year payback period for the NFS's 35% required contribution of $266 million.

**As a condition for building the WSLP Project, the Parish agreed to comply with Federal flood plain management requirements.**

80. The Feasibility Report also makes it clear that federal implementation of the WSLP Project is subject to the NFS agreeing, in a binding written agreement, to comply with applicable federal laws and policies, and to perform several non-federal obligations, including, but not limited, to the following:

a. Provide 35 percent of total project costs as further specified below:

**********

3. Provide all lands, easements, and rights-of-way, including those required for relocations, the borrowing of material, and the disposal of dredged or excavated material; perform or ensure the performance of all relocations; and construct all improvements required on lands, easements, and rights-of-way to enable the disposal of dredged or excavated material, all as determined by the Government to be required or to be necessary for the construction, operation, maintenance, repair, rehabilitation and replacement of the project;

4. Provide, during construction, any additional funds necessary to make its total contribution equal to 35 percent of total project costs;

**********

d. Agree to participate in and comply with applicable Federal floodplain management and flood insurance programs;

e. Comply with Section 402 of the Water resources Development Act of 1986, as amended (33 U.S.C. 701b-12), which requires a non-Federal interest to prepare a flood management plan within one year after the date of signing a project partnership agreement, and to implement such plan not later than one year after completion of construction of the project;

f. Publicize floodplain information in the area concerned and provide this information to zoning and other regulatory agencies for their use in adopting regulations, or taking other actions, to prevent unwise future development and to ensure compatibility with protection levels provided by the project;

g. Prevent obstructions or encroachments on the project (including prescribing and enforcing regulations to prevent such obstructions or encroachments) such as any new developments on project lands, easements, and rights-of-way or the

addition of facilities which might reduce the level of protection the project affords, hinder operation and maintenance of the project, or interfere with the project's proper function;

**Federal law also requires preparation and implementation of a floodplain management plan designed to prevent future flood events in the area of the WSLP Project.**

81. Compliance with federal floodplain management and insurance programs is mandated by 33 U.S.C. § 701b-12, which requires, *inter alia,* preparation and implementation of a floodplain management plan designed to reduce the impacts of future flood events in the WSLP Project area.

82. The regulations enacted to implement 33 U.S.C. § 701b-12 require that all new construction and substantial improvements of residential structures within Zone AE (like the Montegut Tract) on the community's FEMA Flood Insurance Rate Maps ("FIRM") have the lowest floor (including basement) elevated to or above the base floor elevation. *See* 44 CFR § 60.3 (c)(2).

**Louisiana law also requires that the Parish comply with the floodplain management programs mandated by 33 U.S.C. § 701b-12.**

83. Louisiana Revised Statute 38:84 specifically requires that the Parish comply with the requirements of the National Flood Insurance Act, including the requirements pertinent to the management of flood plains, mandated by 33 U.S.C. § 701b-12.

84. In order to meet the requirements of Louisiana Revised Statute 38:84, the Parish enacted Floodplain Regulations, which are found in Chapter 107 of the Parish Code. Section 107-55(1), applicable to residential construction, provides that "[n]ew construction and substantial improvement of any residential structure shall have the lowest floor (including basement), elevated to or above the base floor elevation."

85.  Nearly 80% the 1500 acres that comprise the Bonnet Carré Oil and Gas Field and the Montegut Tract sit on a FEMA flood zone designated "AE" -- a High Risk Special Flood Hazard Area -- and the balance on an area designated "X" -- a Moderate Risk Area.

86. The relevant FEMA Flood Insurance Rate Maps ("FIRM") adopted by the Parish and published in the Parish website (maps 22095C0230, 22095C0240 and 22095C0250) clearly show that nearly 80% of the 1500 acres that comprise the Bonnet Carré Oil and Gas Field and the Montegut Tract have a flood base elevation of 7 to 8 feet and thus are subject to a 100-year flood of between 7 to 8 feet of water. Therefore, if a Katrina-like event should occur in the Parish, every home built on the Montegut Tract would be flooded by waters 7 to 8 feet deep or deeper.

87.  Among the permitted uses in the R-1 district are single-family detached residences, schools, churches and community homes. The Montegut Tract is a high-risk flood hazard area subject to 7 to 8 feet of flooding and is located atop an active oil and gas field. In order to meet the technical requirements of the pertinent federal, Louisiana and Parish flood regulations, single-family detached residences, schools, churches and community homes would have to be built no lower than 7 to 8 feet above ground, even assuming those structures could be built atop an oil and gas field without endangering the lives of their residents. However, building family detached residences, schools, churches and community homes on the Montegut Tract would be inconsistent with Goal 2 and the corresponding objectives and policies of the Parish Comprehensive Plan:

**GOAL 2: Promote Quality Neighborhoods in St. John Parish.**

*Objective: Provide appropriate locations for residential development.*

**Policy:** Residential development should not be encouraged in areas with severe environmental constrains.

In order to protect both the natural environment and residential

> property, residential development should be discouraged from
> locating in flood prone areas or other areas susceptible to
> environmental hazards.  Development in the flood zone should be
> elevated above the 100-year flood level or otherwise designed to
> protect permanent structures from flood damage.

88. Even if the physical structures could be elevated 7 to 8 feet above ground to meet those requirements, and ignoring the environmental hazards posed by building atop an oil and gas field, loss of life could result because "[t]he flood hazard areas of the parish are subject to periodic inundation that results in loss of life and property, health and safety hazards….." *See* Parish Code § 113-3(a). Given the combined potential flood and environmental hazards, the Parish should be preventing and not requiring construction of residential structures on the Montegut Tract.

89. Paradoxically, while federal, Louisiana and Parish regulations discourage or outright prohibit the building of family detached residences, schools, churches and community homes on the Montegut Tract, by assigning the R-1 zoning classification the Parish and the Council mandate that only those types of structures can be built on it.

90. The Council's July 12, 2022 decision to deny the zoning change is arbitrary and capricious because (1) the Council ignored and failed to consider the matters discussed above and (2) the Council's decision is inconsistent with federal, Louisiana and Parish regulations and provisions of the Parish Comprehensive Plan that discourage or outright prohibit the building of single-family detached residences, schools, churches and community homes on the Montegut Tract.

**The Montegut Clay Pit was not able to qualify as an approved clay pit for the WSLP Project because the Parish and the Council refused to apply the correct zoning classification to the Montegut Tract.**

91. Construction of the WSLP levee system requires between 7.0 and 9.0 million cubic yards of material: 2.0 million yards of sand and 7.0 million yards of clay. Approximately 3.5 million cubic yards of clay were expected to be mined from the Bonnet Carré Spillway and the balance of the clay has been acquired from commercial borrow sources approved by the Corps for the WSLP Project.

92. In order to qualify as an approved Commercial Borrow Pit and be able to provide (sell) clay material for the construction of the WSLP levee system, a Commercial Borrow Pit applicant is required to submit to the Corps of Engineers a package containing all the information/documents listed in sections 1 through 14 of the document entitled "Appendix A -- Commercial Borrow Pit Requirements" ("Appendix A") published by the Corps.

93. Section 13 of Appendix A requires that the Commercial Borrow Pit applicant submit evidence of having a proper zoning classification that allows excavation and use as a borrow area:

13. Zoning Classification

Written evidence that the property intended for use as a Commercial Borrow Pit contains the proper zoning classification that will allow excavation and use it as a borrow area. This evidence shall consist of a letter from the local zoning office stating the zoning classification of the Commercial Borrow Pit.

94. The Corps of Engineers set July 16, 2020 as the deadline by which Commercial Borrow Pit applicants who wanted to provide (sell) clay material for the construction of the WPLS levee system were required to submit to the Corps a package of the information/documents listed in Sections 1 through 14 of Appendix A.

95. Plaintiff timely submitted to the Corps of Engineers all the information/documents required by Sections 1 through 12 and 14 of Appendix A.

96. However, plaintiff was not able to comply with the Zoning Classification

27

requirements of Section 13 of Appendix A because the Parish and the Council refused to apply the correct zoning classification to the Montegut Tract, thereby (1) preventing the Montegut Tract from being authorized by the Corps of Engineers as a Commercial Borrow Pit qualified to participate in the WSLP Project, and (2) preventing plaintiff from obtaining the permits required by defendants for the operation of the Montegut Clay Pit.

97. On March 18, 2021, Mr. Bradley Drouant, P.E., Senior Project Manager with the Corps, sent an email to Lee Patterson, a Senior Environmental Scientist with AIMS Group, Inc., stating that the Corps of Engineers had been notified by someone from the St. John the Baptist Parish government that the Montegut Tract did not have "proper zoning, a conditional use permit, and a dirt operation permit" and therefore "we're going to pause review of your submittal until such time these requirements are met." The Parish's misrepresentations to the Corps concerning the proper zoning of the Montegut Tract brought to a halt plaintiff's attempt to get qualified as an approved Commercial Borrow Pit able to provide clay material to the Corps or its contractors for the construction of the WSLP Project. Mr. Drouant's email to Mr. Patterson reads as follows:

> As part of the submittal review we have been notified by St. John the Baptist that AIMS currently lacks a number of local parish permitting requirements including proper zoning, a conditional use permit, and a dirt operation permit for your site at 221 East Airline Hwy La Place, LA. As a result, this site does not currently meet the requirements for consideration as a pre-approved commercial borrow pit as outlined in the Sources Sought and we're going to pause review of your submittal until such time these requirements are met.
>
> Bradley Drouant, P.E.
> Senior Project Manager
> CEMVN-PMO-L

## V. CAUSES OF ACTION.

### A. Taking of property in violation of the United States Constitution.

98. Plaintiff re-alleges paragraphs 1 through 97 of this Complaint and incorporate same by reference.

99. Defendants owe plaintiff the sum of at least $150 million dollars for the permanent *per se* regulatory taking of plaintiff's property in violation of the Takings Clause of the United States Constitution, U.S. CONST., Amend. V ("….nor shall private property be taken for public use, without just compensation"), which defendants effected by classifying the Montegut Tract as Residential District One ("R-1") and by denying a request to rezone it to the correct Rural ("R") classification, preventing plaintiff from obtaining the required permits for the operation of the Montegut Clay Pit and preventing the commencement of the Montegut Mineral Lease.

100. The defendants' improper zoning of the Montegut Tract and their refusal to rezone it have deprived the Montegut Mineral Lease of all its value, which constitutes a taking of plaintiff's property. Therefore, Defendants are required to pay plaintiff just compensation in the sum of at least $150 million.

### B. Taking of property in violation of the Louisiana Constitution.

101. Plaintiff re-alleges paragraphs 1 through 100 of this Complaint and incorporate same by reference.

102. Defendants owe plaintiff the sum of at least $150 million dollars for the permanent *per se* regulatory taking of plaintiff's property in violation of the Louisiana Constitution, La. CONST. art. I, § 4 ("Property shall not be taken by the State or its political subdivisions except for public purposes and with just compensation paid to the owner…."), which defendants effected by classifying the Montegut Tract as Residential District One ("R-1") and by denying a

request to rezone it to the correct Rural ("R") classification, preventing plaintiff from obtaining the required permits for the operation of the Montegut Clay Pit and preventing the commencement of the Montegut Mineral Lease.

103.  The defendants' improper zoning of the Montegut Tract and their refusal to rezone it have deprived the Montegut Mineral Lease of all its value, which constitutes a taking of plaintiff's property. Therefore, Defendants are required to pay plaintiff just compensation in the sum of at least $150 million.

104. Plaintiff is also entitled to recover attorney's fees and all costs of these proceedings, plus legal interest from date of loss and a trial by jury.

## VI. PRAYER FOR RELIEF.

WHEREFORE, plaintiff respectfully requests that the Court award it the sum of at least $150 million dollars owed by defendants for the permanent *per-se* taking of its  property in violation of the Takings Clause of the United States Constitution, U.S. CONST., Amend. V, and the Louisiana Constitution, La. CONST. art. I, § 4.

Plaintiff further prays for an award of attorney's fees and all costs of these proceedings, plus legal interest from date of loss, a trial by jury and all other relief plaintiff is entitled to recover under the circumstances and as allowed by law.

Respectfully submitted by ECF this 6th day of February, 2026.

Camilo K. Salas III (La. Bar No. 11657)
SALAS & Co., L.C.
P.O. Box 58735
New Orleans, LA  70158
Telephone:  504-609-9317
E-Mail:  csalas@salaslaw.com

*s/.  Camilo K. Salas III*

Attorney of Record for Plaintiffs